129 P.3d 1157

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Samuel KEAWEEHU, Defendant–Appellant.**

**No. 26189.**

Intermediate Court of Appeals of Hawai'i.

Feb. 3, 2006.

As Amended March 24, 2006.

Deborah L. Kim, Deputy Public Defender, (Bentley C. Adams, III, Deputy Public Defender, on opening brief), on the briefs, for Defendant–Appellant.

Artemio C. Baxa, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

WATANABE, Acting C.J., LIM, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Samuel Keaweehu (Keaweehu) appeals from the Amended Judgment filed on October 8, 2003, in the Circuit Court of the Second Circuit (circuit

court).[1] Keaweehu was charged in an eleven-count indictment with drug possession and drug paraphernalia offenses. After a jury trial, he was convicted of two counts of Promoting a Dangerous Drug in the Second Degree (Counts 1 and 10), in violation of Hawaii Revised Statutes (HRS) § 712–1242(1)(b)(i) (1993 & Supp.2001),[2] and two counts of Prohibited Acts Related to Drug Paraphernalia (Counts 2 and 11), in violation of HRS § 329–43.5(a) (1993).[3] Keaweehu was sentenced on each of Counts 1 and 10 to a ten-year term of imprisonment, a mandatory minimum term of 40 months as a repeat offender under HRS § 706–606.5 (Supp. 2004), and a mandatory minimum term of one year under HRS § 712–1242(3) (Supp.2001), all terms to run concurrently to each other. He was also sentenced on Counts 2 and 11 to five-year terms of imprisonment to run concurrently with each other but consecutive to Counts 1 and 10.

On appeal, Keaweehu argues that the circuit court erred in 1) instructing the jury on accomplice liability; 2) admitting evidence that a dog trained to sniff narcotics had alerted to currency seized by the police; and 3) denying Keaweehu's motion for judgment of acquittal.[4] We affirm.

## BACKGROUND

In the morning on May 30, 2002, officers of the Maui Police Department (MPD) waited outside the Maui Beach Hotel with warrants to search Keaweehu's Corvette car and Room 130 of the hotel in hand. MPD Officer Howard Rodrigues (Officer Rodrigues) saw Keaweehu, driving alone in a Corvette, turn into the Maui Beach Hotel premises and proceed to the rear parking lot.

Upon Keaweehu's arrival, MPD Officer Randy Esperanza (Officer Esperanza) obtained a key to Room 130 and then joined other officers who had gathered outside the room. Officer Esperanza twice knocked on the door and announced the officers' presence and purpose. When no one answered, Officer Esperanza opened the door. Keaweehu, Stacey Enaena (Enaena) and Debra Robertson (Robertson) were in the room. MPD officers searched the room and found the following drugs and drug paraphernalia: 1) in a dresser drawer, eighteen packets of methamphetamine within a magnetic key holder, additional packets of methamphetamine inside a pouch, a lighter, a digital gram scale, packets containing marijuana, and pouches holding marijuana and an assortment of pills containing methylphenidate, diazepam, and alprazolam; 2) on a lamp stand, a pouch containing four packets of crystal methamphetamine and pills containing oxycodone (the active ingredient in Oxycontin); 3) in the lamp stand drawer, a manual gram scale, a pair of scissors, and a pack of rolling paper; 4) in a television stand drawer, a propane torch, empty plastic packets bearing various logos inside a container, and a cut straw; 5) in an open room safe, a pouch containing numerous empty plastic packets similar to the ones recovered from the television stand drawer and a bag containing marijuana; and 6) in the pockets of shorts [5] on a chair, a glass pipe containing

1. The Honorable Joel E. August presided.

2. Hawaii Revised Statutes (HRS) § 712–1242(1)(b)(i) (1993 & Supp.2001) provides, in relevant part, as follows:
 (1) A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly:
 . . .
 (b) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (i) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

3. HRS § 329–43.5 (1993) provides, in relevant part, as follows:

 (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to ... process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.

4. On November 2, 2005, this court ordered the parties to jointly submit certain trial exhibits that had not been transmitted to the clerk of the appellate courts. On November 18, 2005, the requested trial exhibits were received and filed by the clerk of the appellate courts.

5. The Maui Police Department (MPD) officers did not attempt to determine whether the shorts fit Defendant–Appellant Samuel Keaweehu (Keaweehu).

crystal methamphetamine residue and a plastic container containing marijuana. The drugs and drug paraphernalia were not in open view. The aggregate weight of the crystal methamphetamine seized from Room 130 was 11.8 grams.

On a bed next to where Keaweehu had been standing, the officers found $1,000 in cash in plain view. The officers also recovered a note on the floor behind the dresser addressed to "Sam," telling him to "get some rest" and thanking him for a "great night." The note was signed by "Paula." The officers saw bags, baskets containing clothing, food items, and beer in the room.

Officer Rodrigues assisted in making entry into Room 130 and securing its occupants, but he did not participate in searching the room. Twelve to fifteen minutes after entering Room 130, Officer Rodrigues went to the parking lot to execute the warrant to search Keaweehu's Corvette. Officer Rodrigues testified that the car was unlocked. In the Corvette's center console, Officer Rodrigues found $8,920 in cash along with Keaweehu's driver's license. From the engine compartment, Officer Rodrigues recovered a plastic box containing four packets of crystal methamphetamine. The crystal methamphetamine had an aggregate weight of 6.6 grams. The plastic box had been placed in a small pocketed or walled area of the engine compartment near the headlight. Officer Rodrigues also recovered certificates of registration and title that identified Keaweehu as the registered and legal owner of the Corvette from inside the car.

Officer Rodrigues was unable to lift any fingerprints off the plastic box or the methamphetamine packets found in the Corvette's engine compartment. In addition, no fingerprints were lifted off the items recovered from Room 130.

The jury found Keaweehu guilty of the counts relating to the methamphetamine and the methamphetamine-related drug paraphernalia recovered from Keaweehu's car (Counts 10 and 11) and from Room 130 (Counts 1 and 2). The jury was unable to reach a unanimous verdict on the counts charging him with possession of the marijuana, the Oxycontin pills, and the pills containing methylphenidate, diazepam, and alprazolam found in Room 130 (Counts 3, 4, 6, 8, and 9) and on the counts charging him with possession with intent to use the packaging-material drug paraphernalia associated with the Oxycontin and methylphenidate pills (Counts 5 and 7). The circuit court later granted the motion of the State of Hawai'i (the State) to dismiss with prejudice the counts on which the jury had failed to reach a verdict.

## DISCUSSION

I. The Circuit Court Did Not Err in Instructing the Jury on Accomplice Liability

### A.

The circuit court gave the jury the following instruction on accomplice liability, which tracked the language of the Hawai'i Standard Jury Instruction—Criminal (HAWJIC) Instruction 6.01 (2000):

### Instruction 16

A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

A person is an accomplice of another in the commission of an offense if:

With the intent to promote or facilitate the commission of the offense, he

a. solicits the other person to commit it; or

b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.

Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

Counts 1 and 2 were based on evidence seized from Room 130. The jury instructions on the material elements of the offenses charged in Count 1 and 2 referred to Keaweehu's potential liability "as a principal and/or an accomplice." These instructions, which were given by agreement of the parties, provided, in pertinent part, as follows:

#### Instruction 26

In Count 1 of the indictment, the defendant, Samuel Keaweehu, is charged with the offense of Promoting a Dangerous Drug in the Second Degree.

A person commits the offense of Promoting a Dangerous Drug in the Second Degree if he, *as a principal and/or an accomplice,* knowingly possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more containing the dangerous drug methamphetamine or any of its salts, isomers, and salts of isomers.

There are two material elements of the offense of Promoting a Dangerous Drug in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about May 30, 2002, in the County of Maui, State of Hawaii, the defendant, Samuel Keaweehu, *as a principal and/or an accomplice,* knowingly possessed one or more preparations, compounds, mixtures or substances of an aggregate weight of one-eighth ounce or more; and

2. That the defendant did so knowing that the preparations, compounds, mixtures, or substances contained the drug methamphetamine.

. . . .

#### Instruction 29

In Count 2 of the indictment, the defendant, Samuel Keaweehu, is charged with the offense of Prohibited Acts Related to Drug Paraphernalia.

A person commits the offense of Prohibited Acts Related to Drug Paraphernalia if he, *as a principal and/or an accomplice,* intentionally used, or possessed with intent to use, drug paraphernalia to process, prepare, pack, repack, store, contain, conceal, inhale, or otherwise introduce a controlled substance into the human body.

There are two material elements of the offense of Prohibited Acts Related to Drug Paraphernalia, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about May 30th, 2002, in the County of Maui, State of Hawaii, the defendant, Samuel Keaweehu, *as a principal and/or an accomplice,* intentionally used, or possessed with intent to use, a plastic packet, a magnetic key holder, a digital gram scale, zip-lock bags, a cut straw, a torch propane bottle, and/or a balance type scale; and

2. That the defendant intentionally used or possessed with intent to use such item or items as drug paraphernalia to process, prepare, pack, repack, store, contain, conceal, inhale, or otherwise introduce into the human body a controlled substance, to-wit [sic], methamphetamine.

. . . .

(Emphases added.)

Counts 10 and 11 were based on evidence seized from Keaweehu's Corvette. The jury instructions on the material elements of the offenses charged in Counts 10 and 11 did not refer to Keaweehu's potential liability as an accomplice.

### B.

▮ On appeal, Keaweehu argues that the circuit court erred in instructing on accomplice liability on the grounds that: 1) there was insufficient evidence to support an accomplice liability instruction; 2) the accomplice liability instruction was defective because it did not require proof that a principal had engaged in criminal conduct; and 3) the instructions were confusing and misleading because the court failed to include the *mens rea* for accomplice liability in its instructions on the material elements for Counts 1 and 2. Because Keaweehu raised an objection only

**134**

on ground (1) in the circuit court, his claims on the remaining grounds are subject to the plain error standard of review. *See* Hawai'i Rules of Penal Procedure (HRPP) Rule 30(f); *State v. Matias,* 57 Haw. 96, 100–01, 550 P.2d 900, 903–04 (1976).

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. . . .

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (internal quotation marks, citations, and brackets omitted; block quote format changed). Under the plain error standard, an appellate court has the authority to "correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citing *State v. Fox,* 70 Haw. 46, 56, 760 P.2d 670, 676 (1988)).

### C.

▪ We reject Keaweehu's claim that there was insufficient evidence to support an accomplice liability instruction. When the circuit court's instructions are read and considered as a whole, it is clear that the accomplice liability instruction applied to Counts 1 and 2, but not to Counts 10 and 11. As previously noted, only the instructions for Counts 1 and 2 referred to Keaweehu's potential liability as an accomplice; the instructions on Counts 10 and 11 did not.

▪ In *State v. Tucker,* 10 Haw.App. 73, 861 P.2d 37 (1993), this court held that "[i]t is not error to submit an instruction covering a theory advanced by a party if there is *any* evidence on which to base it, although it may be slight and inconclusive, or opposed to the preponderance of the evidence." *Id.* at 80, 861 P.2d at 42 (emphasis in original; citation omitted). There was evidence from which a jury could have inferred that Keaweehu acted as an accomplice to Enaena or Robertson in the commission of the offenses charged in Counts 1 and 2. For example, the evidence supported the inference that Keaweehu supplied the methamphetamine and methamphetamine packaging material found in Room 130 and thereby aided and abetted Enaena's and Robertson's unlawful possession of those items. The circuit court properly submitted an accomplice liability instruction to the jury.

▪ Keaweehu argues that the accomplice liability instruction was defective because it did not require proof that a principal had engaged in criminal conduct. Reviewing under the plain error standard, we disagree. The accomplice liability instruction, when considered as a whole, sufficiently advised the jury that the charged offense must have been committed for the defendant to be an accomplice. The instruction provided that the defendant "may be guilty because he is an accomplice of another person in the commission of the offense." In addition, the alleged defect in the instruction was not prejudicial. Given the large quantities of methamphetamine and methamphetamine-related paraphernalia discovered in Room 130, it was clear that *someone,* acting as a principal, had committed the offenses charged in Counts 1 and 2. When examined in light of the entire proceedings, the accomplice liability instruction was not prejudicially insufficient, erroneous, inconsistent, or misleading. *Cullen,* 86 Hawai'i at 9, 12, 946 P.2d at 963, 966.

▪ We likewise reject, under the plain error standard, Keaweehu's claim that the jury instructions were confusing and misleading because the material-elements instructions for Counts 1 and 2 did not reiterate the *mens rea* required for accomplice liability. The instructions on Counts 1 and 2 provided

that Keaweehu could be guilty of the offense "as a principal and/or an accomplice" and then proceeded to state the material elements for those offenses in terms of the *mens rea* required for liability as a principal. The separate accomplice liability instruction already identified the appropriate *mens rea* for accomplice liability. As a matter of logic and necessity, the jury would have applied the accomplice liability instruction and thus the proper *mens rea* in considering whether Keaweehu was guilty as an accomplice.

II. The Circuit Court Erred In Admitting the Dog–Sniff Evidence, but That Error Was Harmless Beyond a Reasonable Doubt

A.

Officer Rodrigues testified that after he recovered the money and packets of methamphetamine from Keaweehu's Corvette, he took the evidence to the police station. At the station, he weighed the packets of methamphetamine and took a sample from each of the four packets. Using a pre-manufactured kit, Officer Rodrigues chemically tested the samples, and each tested positive for methamphetamine.

Officer Rodrigues asked MPD Officer Mike Victorine (Officer Victorine), a canine handler, to use his narcotics detector dog to screen the money Officer Rodrigues had recovered. Officer Rodrigues provided a manila envelope containing the money he had seized from the Corvette for the canine screening. Officer Rodrigues was not asked, and thus did not testify, about what steps, if any, he had taken to ensure that the money he seized had not been contaminated with the odor of the methamphetamine he seized or with the odor of the drugs seized by the other officers.

Officer Victorine testified that he was a certified canine handler and that his dog, Timbo, was a certified narcotics detector dog. He described the certification process and stated that he and Timbo were certified yearly as a team and also underwent weekly training. Timbo was trained to detect methamphetamine, cocaine, heroin, and marijuana. Timbo "alerts," signifying the presence of the odor of any of these narcotics, by breathing more rapidly and stiffening its ears and tail, and Timbo "indicates" the source of the odor by sitting, staring at the object, and putting its nose on the object.

Keaweehu's counsel was permitted to *voir dire* Officer Victorine before the officer testified about the results of the canine screening. Officer Victorine acknowledged that a well-trained dog can detect microscopic amounts of drug residue and that there is widespread contamination of our money by narcotics. During Keaweehu's *voir dire* of Officer Victorine, the following colloquy took place:

Q. How does Timbo know the difference between currency that is just general dirty currency that's been exposed by being passed from hand to hand, so that it's picked up residue like cocaine residue— how does Timbo know the difference between that currency or currency that had been freshly exposed?

Isn't that how you know whether it's reliable or not?

A. Well, the dog has been trained to locate the odor of the narcotic, not the substance. Okay? Meaning if I put the substance here (indicating), and I take it away, the odor will stay there until it dissipates. And the same thing happens with currency.

There is a study that's shown that there is a large amount of currency in our U.S. that is contaminated. But there is also studies being done by Dr. Stephen Rose of the Maui—excuse me, the Miami—University of Miami, Florida, that shows that the currency is tainted; however, it will dissipate to a point that the dog will not be able to pick it up.

If the dog shows an alert and indication, that currency has recently been used in a transaction of narcotics.

Officer Victorine stated that Timbo will alert to a stack of bills even if the odor of narcotics is only coming from one bill. He also conceded that he does not know whether Timbo is alerting to an odor that is "a day old, a week old, or a month old." Upon completing *voir dire*, Keaweehu's counsel objected to Officer Victorine testifying about the results of the canine screening on the grounds that

the evidence was inadmissible under Hawaii Rules of Evidence (HRE) Rules 702, 402, 403, and 404(b). The circuit court overruled those objections.

Officer Victorine testified on direct examination that he placed five empty, "clean" manila envelopes on the floor and had Timbo screen them. Timbo did not alert or indicate the odor of drugs. Officer Victorine then asked Officer Rodrigues to place a manila envelope containing the seized money (the target envelope) among the clean envelopes and had Timbo screen the envelopes again. This time, Timbo "showed a very strong alert and indication" on the target envelope.

On cross-examination by Keaweehu's counsel, Officer Victorine testified that the odor of narcotics on currency will dissipate over time to the point where a dog could not detect it. The greater the degree of contamination, the longer the odor will last. Officer Victorine further testified that he did not know how the money to which Timbo alerted got into the target envelope or whether the money had been counted or reorganized by MPD officers. The cross-examination continued as follows:

Q. All right. So you can't really make any representation to this jury and this court as to whether the bills that you were having Timbo alert to had been touched by the hands of officers who had just been through a huge drug bust; correct?

A. Yeah. I don't know what happened prior to that.

Q. So you don't know what kind of transfer may have—may or may not have happened from their fingers onto those bills when they were reorganized and—

A. Correct.

Q. —counted; correct?

A. Yes sir.

Q. Because Timbo is just going to alert to an aroma regardless of the source; correct?

A. The odor, correct. He is not alerting to the currency. He is not alerting to the envelope. He is alerting to the odor that is coming out of it.

After receiving these responses, Keaweehu's counsel renewed his objection to Officer Vic-

torine's testimony. He also moved to strike the testimony under HRE 702 because no reliable basis for the canine screening evidence had been shown. The circuit court overruled Keaweehu's objection, finding that it went to the weight of the testimony, not its admissibility, and denied Keaweehu's motion to strike.

The circuit court permitted jurors to ask questions of witnesses during the trial. After the parties completed their examination of Officer Victorine, a juror submitted the following question, which the court posed to Officer Victorine:

Q. Could the contamination of the money in the car be caused by the officers not changing their gloves after the search in the room?

Officer Victorine gave the following answer:

A. Yeah. Yes. If they didn't change their gloves, there could have been some odor transfer.

### B.

■ On appeal, Keaweehu argues that the circuit court erred in admitting evidence that Timbo alerted on the money seized from Keaweehu's Corvette on the grounds that the evidence was inadmissible: 1) under HRE Rules 702 and 703 because the State failed to lay a proper foundation that the procedures employed in obtaining the evidence were sufficiently reliable; 2) under HRE Rule 402 because the evidence was irrelevant due to the widespread contamination of the money supply with drugs; 3) under HRE Rule 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; and 4) under HRE Rule 404(b) because Timbo's alert could have been based on the odor of drugs, such as cocaine and heroin, that were not seized in this case.

There is considerable debate over the probative value of a narcotics detector dog's alert to currency. *United States v. $242,484.00*, 389 F.3d 1149, 1165–66 (11th Cir.2004) (citing cases on both sides of the debate). Those arguing that such evidence has minimal probative value rely on studies showing that a high percentage of currency in general circulation is contaminated with

trace amounts of cocaine. *See United States v. U.S. Currency, $30,060.00,* 39 F.3d 1039, 1041–43 (9th Cir.1994); *United States v. $5,000 in U.S. Currency,* 40 F.3d 846, 849–50 (6th Cir.1994). They contend that because of the widespread contamination of our currency with drug residue, especially cocaine, a dog's alert to currency is "virtually meaningless." *E.g., Muhammed v. DEA, Asset Forfeiture Unit,* 92 F.3d 648, 653 (8th Cir.1996).

Those arguing that a dog's alert to currency has substantial probative value contest the assumption that a high percentage of currency is tainted with sufficient quantities of drug residue to trigger a dog's alert. *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d 448, 456–59 (7th Cir.2005). Recent cases finding that a dog's alert to currency is entitled to probative weight have cited research and testimony that dogs do not alert to the cocaine itself on the currency, but to the odor of methyl benzoate, a cocaine by-product, which is volatile and dissipates over a short period of time. *Id.* at 455–59; *United States v. $22,474.00 in U.S. Currency,* 246 F.3d 1212, 1216 (9th Cir.2001). According to this research, because the odor of methyl benzoate dissipates quickly, a dog will not alert to trace amounts of cocaine found on currency in general circulation. *Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d at 458–59. Rather, a dog's alert indicates that the currency had recently been in close proximity to a significant amount of narcotics. *Id.*

In response to Keaweehu's questions, Officer Victorine referred to both sides of the debate over whether a narcotics detector dog will routinely alert to currency in general circulation. Had the State laid the proper foundation that the procedures used by the MPD in conducting the canine screening were reliable, we would have agreed with the circuit court that this debate went to the weight, and not the admissibility, of the dog-sniff evidence.[6] We conclude, however, that the State failed to lay an adequate foundation that the procedures used were sufficiently reliable to support the admission of the dog-sniff evidence under HRE Rule 702.

The evidence is undisputed that Officer Rodrigues handled both the methamphetamine and the money he recovered from Keaweehu's Corvette before the canine screening was conducted. Officer Victorine testified that an officer who touched drugs and the money could transfer the odor of the drugs to the money. The State, however, did not adduce any evidence of what precautions, if any, Officer Rodrigues took to ensure that the money he seized from the Corvette was not contaminated with the odor of the drugs that he or the other officers seized. Thus, the jury had no rational means to assess whether the dog's alert to the money was based on contamination by the police officers or a pre-existing odor of narcotics.

To be admissible, expert testimony must satisfy both the relevancy and reliability prongs of HRE Rule 702.[7] *State v. Vliet,* 95 Hawai'i 94, 106–09, 19 P.3d 42, 54–57 (2001). The trial court's relevancy decision under HRE 702 is reviewed *de novo* and its reliability determination for abuse of discretion. *Id.* at 107–08, 19 P.3d at 55–56. Without some evidence showing that the money was not contaminated by the police, the State failed to lay a sufficient foundation for the admission of the dog-sniff evidence under HRE Rule 702. *See also* HRE Rule 703 (permitting the trial court to disallow expert testimony if the underlying facts or data indicate a lack of trustworthiness). The circuit court

---

**6.** As noted in *State v. Vliet,* 95 Hawai'i 94, 19 P.3d 42 (2001), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 108, 19 P.3d at 56 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

**7.** Hawaii Rules of Evidence (HRE) Rule 702 (1993) provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

therefore erred in admitting the dog-sniff evidence and in refusing to strike it.

Cases on chain of custody are instructive. To establish a foundation for the admission of evidence, such as drugs, that is not readily identifiable, the proponent of the evidence must show a chain of custody for the item "with *sufficient completeness* to render it *improbable* that the original item has ... been contaminated or tampered with." *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir.1989) (internal quotation marks and citation omitted; emphasis in original); *see State v. Olivera* 57 Haw. 339, 344, 555 P.2d 1199, 1202 (1976). Once the threshold showing of a sufficiently complete chain of custody has been made, deficiencies in the chain go to the weight of the evidence, not its admissibility. *Cardenas*, 864 F.2d at 1531.

In Keaweehu's case, as a matter of foundation, the State was required to show that it was improbable that the police officers were responsible for contaminating the money with the odor of drugs by adducing evidence that steps were taken to avoid such contamination or that circumstances existed making such contamination unlikely. Had this threshold showing been made, claims of possible police contamination would have gone only to the weight of the dog-sniff evidence, not its admissibility.

### C.

 Although the circuit court erred in admitting the dog-sniff evidence, we conclude that such error was harmless beyond a reasonable doubt. *State v. Holbron*, 80 Hawaiʻi 27, 32 n. 12, 904 P.2d 912, 917 n. 12 (1995). The evidence showed that Keaweehu was the registered and legal owner of the Corvette and was alone in the car when he drove it into the parking lot of the Maui Beach Hotel. Officer Rodrigues found four packets of crystal methamphetamine, weighing a total of 6.6 grams, in a plastic box sitting within an indentation in the Corvette's engine compartment. The unique hiding place for the crystal methamphetamine provided compelling evidence that Keaweehu had placed it there. Indeed, the defense offered no plausible theory of how the crystal methamphetamine could otherwise have found its way into the engine compartment of Keaweehu's car.

The $8,920 in cash found in the Corvette's center console was consistent with Keaweehu being a drug dealer and provided further proof of Keaweehu's knowing possession of the methamphetamine found in his car's engine compartment. Additional corroboration was provided by the crystal methamphetamine, methamphetamine-related paraphernalia, and $1,000 in cash found in Room 130. The jury was aware of the weaknesses of and limitations in the dog-sniff evidence, including that the dog's alert could have been based on contamination by the police. Under these circumstances, there was no reasonable possibility that the erroneous admission of the dog-sniff evidence might have contributed to Keaweehu's convictions on Counts 10 and 11, which involved the methamphetamine and methamphetamine packaging material seized from the Corvette. *State v. White*, 92 Hawaiʻi 192, 198, 205, 990 P.2d 90, 96, 103 (1999). We conclude that even without the dog-sniff evidence, the jury would have found Keaweehu guilty of Counts 10 and 11.

Unlike the evidence seized from Keaweehu's car, the methamphetamine and methamphetamine-related paraphernalia seized from Room 130 could not only be attributed to Keaweehu, but to Enaena and Robertson, who were also in the room. Nevertheless, we conclude that the dog-sniff evidence was also harmless beyond a reasonable doubt as to Counts 1 and 2. At best, the dog-sniff evidence provided a possible circumstantial link between the money in the car[8] and Keaweehu's possession of drugs. As previously noted, however, the seizure of crystal methamphetamine from the engine compart-

8. We reject Keaweehu's contention that it was not clear whether the currency subjected to the canine screening was from his car, Room 130, or some other location. The testimony of Officer Howard Rodrigues, when read in context, makes it clear that only the money the officer seized from Keaweehu's car was subjected to the canine screening. Keaweehu's counsel conceded as much when, in closing argument, counsel questioned why the police had not subjected the money recovered from Room 130 to a canine screening.

ment of Keaweehu's car already established Keaweehu's knowing possession of drugs. The dog-sniff evidence therefore added little, if anything, to the evidence supporting Keaweehu's convictions on Counts 1 and 2.

### III. There Was Ample Evidence to Support Keaweehu's Convictions

Our conclusion that the erroneous admission of the dog-sniff evidence was harmless beyond a reasonable doubt disposes of Keaweehu's claim that there was insufficient evidence to support his convictions. Even without the dog-sniff evidence, there was ample evidence establishing that Keaweehu knowingly possessed the crystal methamphetamine found in his car and in Room 130 and that he possessed with intent to use methamphetamine-related drug paraphernalia found in each location.

### CONCLUSION

The Amended Judgment filed on October 8, 2003, in the Circuit Court of the Second Circuit is affirmed.

